1-10-0-8-2-2 for a quarter of a vote, raise your vote. May it please the court. My name is Martin Dealy. I am representing Appellant Ford Motor Company in this matter. First to begin, I believe the court has issued an order for me to respond regarding subject matter jurisdiction. I did file a motion in response to supplement the record with copies of my properly filed bond in this matter. I hope the court will forgive the oversight on my part, but I did have a properly filed bond. An order was granted allowing me on January 25, 2011, to supplement the record. And I hope the court will allow me to supplement it. When you say you had a properly filed bond, was the bond filed after you took the appeal? No. The bond was filed when we appealed from the commission to the circuit court. It just wasn't included in the record. And that was my oversight. I have a copy of the bond here. I've submitted it. It was filed as of June 4, 2009, on May 12, 2009. So it was filed before you took an appeal to the circuit court? Yes. In line with the rules. Before you took the appeal to the commission? No, before I took the appeal to the circuit court, from the commission to the circuit court. Properly filed. I hope the court will allow me to supplement the record pursuant to the prior order and my motion. Prior order of January 11. Do you have any objection? Or January 25, 2011. All right, Your Honor, let's move on to the substantive case. There were two awards in this case, Your Honor. There was an award of 09-WC455 relating to an alleged date of loss, either February 14, 2003 or February 17, 2003, depending on the evidence. We're asking the court to overturn that. It was an award of 12.5% loss of use person as a whole, 221 and one-sevenths weeks of TTD, a medical bill of $1,704. We're asking that this be awarded or overturned as it is against the manifest way to the evidence. The award 09-WC456 or 09-IWC456 was an award of 7.5% loss of use person as a whole relating to an April 19, 2002 date of loss. That award we are no longer contesting. That award we're moving pursuant to our pleadings to enter. The earlier date of loss basically revolved around an L5S1 herniated disc where the petitioner, as an employee for Ford Motor Company, did in fact report an injury in September of 2002 relating back to April 2002. Had two epidurals, I believe, and then returned to work, full-duty work, in January of 2003. Whereupon, according to her own testimony, either on February 14, 2003 or the application for adjustment of claim February 17, 2003, she again suffered re-injury but now claims cervical spine injuries, injuries to her neck, which we are contesting, first of all, that any injury occurred whatsoever to her neck pursuant to the medical records and her testimony. Isn't there a testimony from Dr. Smith to support the claimant's testimony? Yes. We believe, however, that his testimony is contrary to what went on in the record and certainly contrary to what she was stating to her own physical therapist, Jason Waters, who she reports to on February 19, 2003. Dr. Smith doesn't come into the picture until 2004 in a second report dealing with specifically the neck in January 2006. The arbitrator found the claimant was credible, didn't he? He did, Your Honor. We find, however, that the arbitrator was mistaking in a lot of his assertions and inferences, including his assertion, I believe, in my brief page A7 of the appendix. First of all, arbitrator's underlying reasoning is that all the doctors, all Petitioner's treating doctors, except for the Section 12 doctor retained by Ford, found, in fact, that Petitioner did suffer a cervical injury and that it was related to the February 2003 date of loss. However, if you look at the record specifically, she is treating at this time for the lower back. She's treating with a physical therapist, Jason Waters. He's making daily reports. He makes an initial report February 19, 2003. She makes no mention whatsoever of her cervical spine, any problems, any state of well-being in her cervical spine. Treatment is to her lower back and lower extremities solely. She has 24 times that she visits Jason Waters through a course of three months. She's going about two to three times a week, 24 times. And counselor in his brief can only point out one reference to scapular pain, which, first of all, lets us know that when he does, in fact, hear an upper extremity complaint, he is noting them. And, in fact, she is not making upper extremity complaints. I think you can use this, and it's the inferences from that evidence so clearly are contradictory to the inferences that arbitrator DeVant drew that, pursuant to the case law, this panel can only come up to one conclusion, and that is, in fact, as you get the window to what's going on in her life from February 19, 2003 through April 19, 2003, she's, in fact, not suffered a cervical injury whatsoever. And which case law compels that conclusion upon this panel? I mean, there must be some case that ties our hands, apparently. I wouldn't say it would tie our hands, but when evidence is so serious, in standard with Peoria Murders v. Industrial Commission, Caterpillar v. Industrial Commission, where, in fact, the courts have overturned, overturned findings of the commission, and overturned it. Oh, yes. I think we could agree. I think you're correct. If it's against the manifest weight of the evidence, what happens to the conclusion is clearly apparent. Yes. But as my learned presiding justice colleague opined, what about if the commission chooses to believe the claimant backed up by the doctor's testimony? Isn't that enough? Or why can't there be enough? Because in particular fact situations, which is always what's required in these types of situations, in particular fact situations, when evidence is so extreme, first of all, when evidence is so extreme and they've not borne their burden of proof, petitioner still has to bear their burden of proof to establish time, place, how the accident occurred, the when, where, what, when, why, and, in fact, that an injury occurred. Here, basically the findings of all the doctors, there's been no greater finding than a disc bulge. There's been no actual establishment of even a cervical injury. And if this court and panel looks at, in fact, the point in time and the window into her life in February, March, and April of 2003, she's making no complaints whatsoever to a physical therapist who's treating her, who's treating her for another part of her spine, another part of her back. I believe that this evidence is so conclusive and so serious to impeacher that the court can only come to one conclusion and, therefore, the inference of, or the inferences drawn and the conclusions drawn by the commission are, in fact, completely contrary to the manifest way to the evidence. What about the work-related activities aggravated or preexisting condition? What would happen then? Probably, but they didn't present that as this type of case. They present this as a new type of injury. There would be a subtle shifting of the burden of proof if they don't present it in the first place. It's not my job to rebut it. They presented a case, basically, through her testimony, through this record, that either on February 14, 2003, or February 17, 2003, she suffered doing X activities on the line at Ford, neck and lower back injuries. Now, she has the history of low back injuries. She's certainly treating for the aggravation. However, the neck injury and the basis for which 09WC455, an arbitrator defense decision, underlying was basically based on the claims of neck injury. And, again, first of all, we don't really have many findings of a neck injury, soft tissue at best. Second of all, we have her own activities, her own statements to her physical therapist, which are in this record, contained in this record, basically where she's not complaining whatsoever about cervical spine injuries. I believe in light of this evidence that the award of arbitrator defense and the award of the commission on 09WC455 should be overturned. Now, she goes on. She doesn't start taking time off until September of 2003, and then would continue to be off for another 221 and 17 weeks of time. Now, basically, her reasoning, her own testimony, medical records reflect that that is in large part due to the state of ill-being she's claiming in her neck, not in large part due to the state of ill-being that she claims in her lower back, which apparently treatment for was successful. The treatment is ongoing, basically, through early 2003. Again, February, March, April 2003. There are also, in fact, we are also relying basically on treating doctors that are about that time, including Dr. Ganju, who saw her honor about, I believe, February 28, 2003, who does an examination of the neck and basically comes back with no real findings of neck injury, although he does find low back problems and low back symptoms. We did have a Section 12 exam done by Dr. Thomas Gleason. However, his opinions and findings are in line with, in fact, treating doctors and physical therapists in this matter. And it's my contention, I'm not asking this panel to substitute their judgment, their rulings for the Commission's rulings. I'm saying the Commission just got it wrong, and the fact that in light of this evidence, in light of specifically 24 visits to a physical therapist immediately after, within two days, starting February 19, 2003, where there's no mention whatsoever of cervical discomfort, no mention of cervical problems when she's, in fact, actively treating with someone for her back, I think that that would be a conclusion that's only conclude, the manifest way to the evidence would only lead you to conclude that, in fact, she did not suffer injury to her cervical spine. Therefore, considering that arbitrator's defense and the ruling of arbitrator defense relying on neck injury for the award of 221 weeks of TTD, again, based on an injury that is suspect at best, findings of disc bulge, and many years later, reverse of lordosis, although that's not found in the MRIs in 2003 either that Counselor alludes to, that I think that this case can only lead to one conclusion, and that is, in fact, that the ruling of the Commission is against the manifest way to the evidence. Thank you, Counsel. Counsel, please. Good afternoon, Your Honors. Counsel, my name is Edward Lichtenstein. I represent the petitioner, the appellee in this case, Carrie Holmes. She's a 30-plus-year-old woman that worked for Ford Motor Company on the assembly line, and she testified that her job required her to lift 30-pound pieces of steel, each weighing approximately – they were 30-pound pieces of steel. She had to do that 400 times an hour. The brief procedural history involved in this case is that there was a decision in favor of the petitioner entered by Arbitrator Charles DeVrend on August 8, 2008. Then there was a unanimous decision by the Workers' Compensation Commission upholding the arbitrator's decision on May 12, 2009. Then there was a Circuit Court decision upholding the Workers' Compensation Commission on February 24, 2010. The appellant's arguments have been made at the arbitration level, at the Commission level, at the Circuit Court level, and all three have found his arguments and evidence to be insufficient. The standard of review before us today is the manifest way to the evidence. The test is whether the evidence is sufficient to support the Commission's findings, not whether this Court or any other tribunal might reach an opposite conclusion. The Circuit Court and the appellate court are prohibited from substituting its own judgment or drawing its own inferences from the evidence. If a rational basis can be discerned from the Commission's decision, the decision must be affirmed even if other reasonable conclusions could be drawn. I'm aware that it is this Court that decides whether or not there was sufficient evidence in the record to support the decision. The appellant argues that the wrong evidence was used as the basis of the Commission's decision. He argues that different evidence should be given more weight. This is the role of the fact binder, not of the reviewing court. Why don't you just tell us what evidence supports this decision? Yes, Your Honor. If you look at the record, page 42, the arbitrator indicates that Cary Holmes' testimony was credible. On page 42, he also says that Cary Holmes' testimony was confirmed by the treating doctors. If you look at pages 242 and 530, he looks at Dr. Payne's treating records, in which on February 18, 2003, she complains of pain radiating in her legs and up the spine, and offers restrictions. If you look at February 28, Dr. Ganju, pages 349 to 350, while counsel had just mentioned that Dr. Ganju didn't find anything cervically related, he certainly prescribed a cervical MRI, which he did undergo. So she must have made complaints to him about her neck, or why else would he do that? He also put in a diagnosis of paresthesis in the arms, which, from my limited experience, indicates that there's something from the neck affecting the nerves in the arms. Further, if you go on June 19, 2003, and look at the record from Dr. Prochka, Dr. Prochka notes a 6 out of 10 rate of pain, and also limited cervical range of motion. Counsel made quite a point to talk about this Jason Watson, who is a physical therapist. It might be noted that the physical therapist gets his orders from the doctor, and the doctors that she was going to at that time were suggested to her by the respondent, and when she went to South Suburban Physical Therapy, she went there for a physical therapy cervical evaluation, and this is demonstrated on June 20, 2003, in page 201. And they noted tenderness at C567. She also had two MRIs in her neck, the first one being in March of 2003, and the second one being in February of 2005. And did they show anything that would support the claim? Yes, they showed positive findings, and in fact, Dr. Smith in his report indicated that the second MRI, the February 4, 2005 MRI, showed further narrowing and a progression of her illness. Speaking of Dr. Smith, his reports are, he confirms her testimony on page 42, and his first report is found on 341 and 342, dated November 2, 2004, and he notes in the report the development of low back pain and severe pain in the neck. He issues a second report on January 30, 2006, pages 343 and 344, and it's in that report that he notes that there is further narrowing in the C6-7 disc space and increased bulging at C6-7. Holmes' testimony itself is corroborated by Ford's medical department's own records. On April 19, 2002, pages 357 and 358, there is a reference to lower back strains and restrictions. On February 13, 2003, there is a note that the patient, Ms. Holmes, is supposed to see Dr. Payne for an appointment. There's a prescription for physical therapy. It's a thoracic strain, and there are new restrictions noted that begin on 2-1803, which is consistent with her complaints of neck problems. On March 3, 2003, in the Ford medical department records, pages 554 and 555 on the record of appeal, there's a Dr. Ganju's appointment noted. There's a note that there's a prescription for a cervical MRI. There's a diagnosis of lumbar pain, upper extremity, paresthesis, and that she has new complaints about neck, abdomen, both arms, and nearly her whole body, and there are continued restrictions. On September 22, 2003, Dr. Preje, the treating physician for Ms. Holmes, fills out a Ford medical certificate that's located at 204-205, and in that certificate, she indicates that there's a diagnosis of neck and low back pain, that she has permanent restrictions, and that her disability is due to her occupation. There's a specific spot where that's asked, and it's so indicated. Dr. Smith concurs in her findings, and on page 43 of the record on appeal, the arbitrator specifically says that Dr. Gleason's report, that's the section 12 examinator, he finds that unpersuasive. I respectfully request that the affirmance of the circuit court's decision, because the facts, the law, and the standard of review taken together require that that be the proper relief. Thank you. Thank you, counsel. We'll vote on it. Briefly. To begin, Dr. Smith's problems with his report is he presents a continuing scenario of a continuing deterioration of the cervical spine, when in fact he's reviewing Petitioner's MRIs and records in 2005, and she hadn't worked since September of 2003. Therefore, there's an inherent inconsistency and a fatal inconsistency with Dr. Smith's opinions in his review. Again, there's been little recounting by counsel of my way of treatment or actually anything going on with Petitioner's cervical spine other than her self-serving complaints. Again, self-serving complaints that she apparently is not making to someone who could actually treat her, is actually looking at her on at least a two- to three-day basis from February 19, 2003, on through March, April 2003. Furthermore, at the end of the day, the most we ever find here, the most the MRIs ever reveal is a disc bulge. Now, there's been no evidence initially that that disc bulge deteriorated or that in fact there was any findings at all in the original 2003, March 2003 MRIs, that there was anything other than degenerative changes in the spine. That's part of the record. There's been no finding of like a deteriorating or an accelerating disc bulge that's referenced to certainly in Arbitrator DeVant's findings, in Arbitrator DeVant's review of this evidence. Again, if you look at what's going on in this Petitioner's life and her claims of neck injury, immediately after the accident happened, when in fact Respondent Ford is paying for and sending her for treatment for her low back, she has no treatment whatsoever, no complaints whatsoever to in fact the physical therapist, who's the one taking the most detailed day-to-day copious notes of her complaints and day-to-day complaints through February, March, April 2003, until he releases her to a state of stable in being to her lower back. And then she returns, and again the award of TTD, and the reasoning for the award of TTD is based on the ill condition of her neck, which is segregated out from the 7.5% loss of use on the 456 claim that originally goes back to the April 2002 day-to-day loss. Thank you. Any questions? Thank you, Counsel. The Court will take the matter under advisement for disposition.